# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Thrivent Financial for Lutherans,<br><br>      Plaintiff,<br><br>v.<br><br>R. Alexander Acosta,[1] Secretary of Labor,<br>and United States Department of Labor,<br><br>      Defendants. | Case No. 16-cv-03289 (SRN/DTS)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Andrew B. Kay, Catherine R. Reilly, Cozen O'Connor P.C., 1200 Nineteenth Street Northwest, Washington, District of Columbia 20036, Christopher L. Schmitter, and Mark L. Johnson, Greene Espel PLLP, 222 South Ninth Street, Suite 2200, Minneapolis, Minnesota 55402, for Plaintiff.

Galen Thorp and Emily Sue Newton, U.S. Department of Justice, Civil Division, 20 Massachusetts Avenue Northwest, Washington, District of Columbia 20530, for Defendants.

Deepak Gupta, Gupta Wessler PLLC, 1735 Twentieth Street Northwest, Washington, District of Columbia 20009, and Vildan A. Teske, Teske, Micko, Katz, Kitzer & Rochel, PLLP, 222 South Ninth Street, Suite 4050, Minneapolis, Minnesota 55402, for Amici Curiae.

---

SUSAN RICHARD NELSON, United States District Judge

      Currently before the Court are the Motion for a Preliminary Injunction [Doc. No. 102] filed by Plaintiff Thrivent Financial for Lutherans ("Thrivent"), the Motion for a Stay

---

[1] Thomas E. Perez resigned as Secretary of Labor on January 20, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), his successor, R. Alexander Acosta, automatically substitutes as defendant.

[Doc. No. 75] filed by Defendants R. Alexander Acosta, Secretary of Labor, and the Department of Labor (collectively, "DOL"), and cross motions for summary judgment [Doc. Nos. 14 & 22] filed by the parties.[2]  For the reasons set forth below, Plaintiff's Motion for a Preliminary Injunction is granted, Defendants' Motion for a Stay is granted, Plaintiff's Motion for Summary Judgment is denied without prejudice, and Defendants' Motion for Summary Judgment is withdrawn.

## I.    BACKGROUND

Thrivent brought this suit pursuant to section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, challenging a requirement contained in a recent DOL rule which it claims would effectively prohibit it from requiring individual arbitration to resolve disputes with its members.  Thrivent argues that the new requirement contravenes the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., which broadly "reflects an emphatic federal policy in favor of arbitral dispute resolution."  *KPMG LLP v. Cocchi*, 565 U.S. 18, 25 (2011) (citation omitted).  In its Complaint, it asks the Court to declare the requirement in violation of the APA and the FAA, and enter a permanent injunction prohibiting its enforcement.  (*See* Compl. at 28 [Doc. No. 1].)

### A.    Plaintiff's Structure and Dispute Resolution Process

Thrivent is a not-for-profit, member-owned and governed fraternal benefit society

---

[2] The Court has also received and reviewed the brief filed by amici curiae AARP, AARP Foundation, American Association for Justice, Americans for Financial Reform, Better Markets, Inc., Consumer Federation of America, and Public Investors Arbitration Bar Association.  (*See* Mot. to Appear as Amicus Curiae [Doc. No. 28], Ex. 1.)  Amici submitted their brief in support of DOL's opposition to Plaintiff's summary judgment motion and in support of DOL's summary judgment motion.

incorporated in Wisconsin. (Johnston Decl. ¶¶ 3, 4 [Doc. No. 18].) As a fraternal benefit society, Thrivent is required by law to ensure that its members are bound by a common bond. *See* I.R.C. § 508(c)(8); *Nat'l Union v. Marlow*, 74 F. 775, 778–79 (8th Cir. 1896); *Hip Sing Ass'n Inc. v. Comm'r*, T.C.M. (CCH) 1092 (T.C. 1982). Since 2013, that common bond has been Christianity. (Johnston Decl. ¶ 4; *id*, Ex. B.) Today, Thrivent has nearly 2.5 million members nationwide. (*Id.* ¶ 4.)

Pursuant to Wisconsin state law, Thrivent is required to provide insurance benefits to its members. *See* Wis. Stat. § 614.01(1)(a)5. It meets this requirement with a broad range of insurance and financial products and services, including traditional life insurance offerings, annuities, disability insurance, long-term care coverage, mutual funds, retirement planning, and money management services. (*See* Kinney Decl. ¶ 3 [Doc. No. 17].) Several of the products Thrivent offers are proprietary in nature, such as fixed indexed[3] and fixed rate[4] annuities. (*Id.* ¶ 4.) These latter offerings have the benefit of being acquirable through an Individual Retirement Account ("IRA"), in contrast to traditional life insurance products. (*Id.*)

Thrivent asserts that many of its members are individuals and families of modest

---

[3] According to Thrivent, a fixed indexed annuity bases its interest rate on an external market index, such as the S&P 500, with a guarantee that the rate will never fall below zero. (Kinney Decl. ¶ 5.) The policyholder does not directly participate in any security investment—rather, the insurance carrier assumes the investment risk, guaranteeing the fixed indexed annuity can never lose value based on the performance of the equity markets. (*Id.*)

[4] A fixed rate annuity "guarantees a minimum interest rate set by the insurance company. The policy may provide a guaranteed interest rate for the lifetime of the annuity or may allow the insurance company to reset the interest rate periodically." (Kinney Decl. ¶ 4.)

means.  The majority of its account holders have annual household incomes under $75,000, and nearly half of its 333,000 IRA annuity contracts have cash values of less than $25,000. (*Id.* ¶ 8.)  Because most of these members trade infrequently and do not need ongoing financial advice, Thrivent's financial representatives work under a "transaction-based" compensation model, meaning they receive a commission for each transaction.  (*Id.*) Thrivent asserts that this model is more appropriate for most of its members than the competing "fee-based" model, where the consumer pays compensation periodically based upon a percentage of the assets under management, or as a flat rate, regardless of whether transactions occur.  (*Id.*)

Since 1999, Thrivent has required that disputes with members related to insurance products be resolved through its Member Dispute Resolution Program ("MDRP").  (*See* Johnston Decl. ¶ 9.)  The MDRP provides for a multi-tiered dispute resolution process, escalating eventually (if necessary) to binding arbitration based on the rules of the American Arbitration Association.  (*See id.,* Ex. B at § 11(c).)  Of particular relevance to this matter, the MDRP mandates that all mediation or arbitration be individual in nature—representative or class claims of any sort, whether arbitral or judicial, are expressly barred.  (*See id.*, Ex. B at § 11(e).)  Thrivent contends that its commitment to individual arbitration is "important to the membership because it reflects Thrivent's Christian Common Bond, helps preserve members' fraternal relationships, and avoids protracted and adversarial litigation that could undermine Thrivent's core mission."  (*See id.* ¶ 9.)

### B.	The Relevant Regulatory Framework

Retirement investment advice, such as is offered by Thrivent, is governed by several

different regulatory and supervisory regimes, including federal securities laws, state insurance regulation, and industry self-regulatory bodies. (*See* AR344-45.)[5] Of particular relevance to the present matter is the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1001 *et seq.* Among other requirements, ERISA prohibits investment advisers classified as "fiduciaries" from engaging in actions that would constitute a conflict of interest. *See id.* § 1106(b); *see also* I.R.C. § 4975(c)(1). For example, a fiduciary is prohibited from self-dealing, and from "receiv[ing] any consideration for his own personal account from any party dealing with the plan in connection with a transaction involving the assets of the plan." *See* 29 U.S.C. § 1106(b)(3); *see also* I.R.C. § 4975(c)(1)(F). For purposes of ERISA, a "person is a fiduciary with respect to a plan" if, among other things, he "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so . . . ." 29 U.S.C. § 1002(21)(A)(ii) (the "investment advice" prong).

Pursuant to statute and executive order, DOL has been granted interpretive, rulemaking, and exemption authority for the "fiduciary" definition and the prohibited transaction provisions, both in ERISA and the parallel provisions of the Code. *See* 29 U.S.C. § 1135; Reorganization Plan No. 4 of 1978, § 102, 43 Fed. Reg. 47,713 (Aug. 10, 1978). In 1975, DOL issued regulations establishing a five-part test for determining whether someone qualifies as a "fiduciary" under the "investment advice" prong of 29

---

[5] References to documents denoted "AR[XXX]" are to pages of the Administrative Record filed as a joint appendix to the parties' summary judgment motions. (*See* App. [Doc. No. 41].)

U.S.C. § 1002(21)(A)(ii). *See* 40 Fed. Reg. 50,842 (Oct. 31, 1975). Under this test, a financial adviser became a fiduciary only if (among other things), he or she provided advice on a regular basis and the parties had a "mutual agreement" that the advice would serve as a primary basis for investment decisions. *See id.* The 1975 regulations did not cover Thrivent's sale, marketing, or advice to members regarding IRAs and distributions from 401(k) and other ERISA retirement plans. (*See* Johnston Decl. ¶ 14.)

On April 8, 2016, DOL issued a new rule that expanded the definition of "fiduciary," as well as the type of retirement advice covered by fiduciary protections. (*See* Final Rule, Definition of the Term "Fiduciary"; Conflict of Interest Rule—Retirement Investment Advice, 81 Fed. Reg. 20,946 (Apr. 8, 2016), AR001 (the "New Rule").) Under the New Rule, a person is deemed to be rendering investment advice for purposes of 29 U.S.C. § 1002(21)(A)(ii) if that person makes certain "recommendations" to a retirement saver regarding "securities or other investment property," including recommendations with respect to rollovers, transfers, or distributions from a plan or IRA. *See* 29 C.F.R. § 2510.03-21(a)(1). Here, the parties apparently agree that Thrivent's commission structure and sale of proprietary insurance products constitute prohibited transactions under the New Rule. *Cf. Chamber of Commerce v. Hugler*, No. 3:16-cv-1476-M, 2017 WL 514424, at *7 (N.D. Tex. Feb. 8, 2017) ("Under the [New Rule], a person suggesting a consumer buy a particular annuity to hold in an IRA would assumedly 'render investment advice.'"). Fiduciaries that engage in prohibited transactions are subject to an excise tax equal to fifteen percent of the amount of the prohibited transaction. *See* I.R.C. § 4975(a). If the prohibited transaction is not corrected within the tax year, however, it is further subject to a tax "equal to 100 percent

of the amount involved." *Id.* § 4975(b).

To ameliorate some of the harshness of the New Rule, DOL promulgated a number of regulatory exemptions that would permit qualifying entities to continue to receive certain forms of compensation (such as commissions), and engage in otherwise prohibited transactions, without incurring punitive taxes. For purposes of this matter, the relevant exemption is known as the "Best Interest Contract Exemption" ("BIC Exemption"). In order to qualify for the BIC Exemption, affected financial institutions and professionals must agree to a number of conditions designed to ensure the maintenance of fundamental fiduciary standards. (*See* AR063.) With regard to advice to IRA investors, the BIC Exemption mandates that these specific conditions be contained in a contract between the financial institution and the retirement investor. (*See* AR078.) Of particular importance here, while the conditions permit these contracts to include individual arbitration agreements, the Exemption is *not* available for contracts that waive or qualify the investor's right "to bring or participate in a class action or other representative action in court in a dispute with the Adviser or Financial Institution." (AR134.) As originally contemplated by DOL, financial institutions wishing to avail themselves of the BIC Exemption are to implement such contracts with their investors by January 1, 2018. (AR140.)

Thrivent contends that because of its business model, it cannot continue to offer its current line of insurance products to its members without relief from the punitive taxation tied to the New Rule. (*See* Compl. ¶ 12.) However, because its MDRP—which is

incorporated into every one of its insurance contracts[6]—requires individual arbitration and expressly bars class or representative claims, Thrivent asserts that it cannot currently comply with the BIC Exemption requirements. (*See id.* ¶¶ 13, 77, 78.) Accordingly, it argues that DOL has left it with the choice of either changing the terms of the MDRP or altering its business model—neither of which, for various reasons, it wishes to do. (*See id.* ¶¶ 77, 78.)

### C.    Procedural History

Thrivent filed the present suit on September 29, 2016, asserting that the BIC Exemption's bar on class action waivers violates the FAA and is accordingly unenforceable because it exceeds DOL's statutory authority. (*See id.* ¶¶ 85–90.) By way of relief, Thrivent asked that the Court declare the class action waiver bar to be in violation of the APA and the FAA and enjoin its enforcement. (*See id.* at 28.) Both parties agreed to proceed immediately with summary judgment briefing. (*See* Scheduling Order [Doc. No. 10].)

Initially, DOL argued that the BIC Exemption's ban against class-action waivers did not violate the FAA, and that, pursuant to 28 U.S.C. § 1108(a), DOL had the authority to condition exemptions on adherence to certain standards, including allowing class actions. (*See* Defs.' Summ. J. Mem. at 21–26 [Doc. No. 24].) The amici also asserted this argument in support of DOL's position. (*See* Amicus Mem. at 16.)

However, shortly after the submission of the summary judgment briefing, but prior

---

[6] Wisconsin state law requires that a fraternal benefit society's bylaws be incorporated into all contracts with its members. *See* Wis. Stat. § 632.93(1). Thrivent's MDRP is included as section 11 of its bylaws. (*See* Johnston Decl. ¶ 8.)

to the hearing on the motions, DOL requested a stay of the proceedings. (Defs.' Feb. 15, 2017 Letter at 1 [Doc. No. 42].) DOL informed the Court that on February 3, 2017, the President issued a memorandum to the Secretary of Labor, directing him to examine the Fiduciary Duty Rule and to prepare an updated legal and financial analysis concerning certain aspects of the Rule. (*Id.*) Defendants stated that as part of the Department's review process, "Plaintiff may be afforded another opportunity to seek an administrative change to the [applicable portion of the Rule]. And the Department could act to revise or rescind the challenged provision." (*Id.* at 2.)

Additionally, on March 1, 2017, DOL informed the Court that (1) the Department had proposed an extension of the April 10, 2017 applicability date for the rulemaking and exemptions, and initiated a 45-day comment period, and (2) in *Hugler*, 2017 WL 514424, the court granted summary judgment to DOL on an FAA claim challenging the provision at issue here. (Defs.' Mar. 1, 2017 Notice at 1 [Doc. No. 45].)

The Court declined to issue a stay at that time, (*see* Feb. 21, 2017 Order [Doc. No. 44]), and heard argument on the cross summary judgment motions. (*See* Mar. 3, 2017 Hr'g Tr. [Doc. No. 61].)

In July 2017, DOL filed a notice of withdrawal of its cross-motion for summary judgment and its opposition to Plaintiff's summary judgment motion, explaining that "the Department no longer defends the one regulatory provision challenged in this action—the application of [BIC] Exemption § II(f)(2) to arbitration agreements [ ]." (Defs.' Withdrawal Notice at 1 [Doc. No. 71].) Also, DOL renewed its request for a stay, arguing that because the challenged provision was not yet applicable to Thrivent, and DOL was reassessing both

the exemption and broader rulemaking, a stay would promote judicial economy and likewise conserve the parties' resources.[7]  (Defs.' Mem. Supp. Mot. to Stay at 1–2 [Doc. No. 78].)

Thrivent opposes DOL's Motion to Stay, arguing that neither the possibility of future regulatory changes, nor DOL's change of legal position, supports a stay.  (Pl.'s Opp'n Mem. to Defs.' Mot. to Stay at 10–12 [Doc. No. 84].)   Moreover, Thrivent asserts that while DOJ fails to assert any hardship that it would suffer absent a stay, Thrivent will suffer irreparable harm if the Court grants a stay.  (*Id.* at 16–19.)

Shortly thereafter, Thrivent filed its Motion for a Preliminary Injunction.  Although Thrivent would prefer a ruling on its Motion for Summary Judgment, (*see* Pl.'s Mot. for Prelim. Inj. at 2), short of a dispositive ruling, it asks the Court to issue a preliminary injunction enjoining Defendants, as well as all other federal agencies, from implementing or enforcing against Thrivent the BIC Exemption to DOL's Fiduciary Rule.  Moreover, if a preliminary injunction is granted, Thrivent "would be willing to explore an appropriately-crafted stay" of these proceedings.  (Pl.'s Mem. Supp. Mot. for Prelim. Inj. at 2, n.1 [Doc. No. 104].)

---

[7] On November 2, 2017, DOL apprised the Court of recent developments in its reassessment process, stating that on November 1, 2017, it had submitted to the Office of Management and Budget ("OMB") a proposed notice of final amendments, one of which relates to DOL's proposal to delay, for 18 months, the January 1, 2018 applicability date of the BIC Contract Exemption.  (Defs.' Nov. 2, 2017 Notice at 1–2 [Doc. No. 109]) (citing OMB, List of Regulatory Actions Currently Under Review, https://www.reginfo.gov/public/jsp/EO/eoDashboard.jsp).

## II.     DISCUSSION

### A.     Mootness

In light of DOL's changed position, the Court first considers whether it retains jurisdiction to consider the parties' pending motions.   Pursuant to Article III of the Constitution, cases that do not involve actual, ongoing controversies, are moot and must be dismissed for lack of jurisdiction. *See Teague v. Cooper*, 720 F.3d 973, 976 (8th Cir. 2013). "Mootness is often described as 'the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)'." *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 491 (7th Cir. 2004) (citations omitted).   "The underlying concern is that, when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citations and quotations omitted).

"Voluntary cessation" is a sub-doctrine of mootness law under which a defendant's voluntary cessation of a challenged practice will not generally deprive the court of its power to hear the merits of the case. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000).   However, an exception to this general rule occurs when events make it clear that the "allegedly wrongful behavior could not reasonably be expected to recur." *Teague*, 720 F.3d at 977 (citations omitted).   Particularly where the defendant is the government, courts presume that the change in behavior is not merely one of litigation strategy, but is made in good faith. *See, e.g., Am. Cargo Transp., Inc. v. United States*, 625

F.3d 1176, 1180 (9th Cir. 2010).

DOL now concedes that the BIC Exemption's anti-arbitration condition contravenes the FAA, (*see* Aug. 10, 2017 Hr'g Tr. at 3–4 [Doc. No. 96]), and asserts that it will not enforce violations of that condition against Thrivent. (*See* Defs.' Opp'n Mem. to Pl.'s Mot. for Prelim. Inj. at 12 [Doc. No. 107]) (citing Pl.'s Aug. 30, 2017 Letter, Ex. B (Field Assistance Bulletin 2017-3) [Doc. No. 97-2].) While DOL acknowledges that its actions *in the near future* are *likely* to moot the case, (Defs.' Mootness Mem. at 3 [Doc. No. 101]) (emphasis added), it concedes that the case is not yet moot. (*See* Aug. 10, 2017 Hr'g Tr. at 5) ("[W]e agree that the case is not yet moot because until the administrative process concludes and the provision is off the books, the case is not moot.") DOL also represents that it is coordinating a non-enforcement policy with the IRS. (*See id.* at 34–35.) But it appears that these efforts are "ongoing," and are neither definite nor complete. (*Id.*) DOL further recognizes that enforcement of the Rule does not rest exclusively with the government, and if the applicability date is not delayed as proposed, a retirement investor could assert an ERISA enforcement claim against Thrivent for actions in any period during which the challenged provision applies. (Defs.' Mootness Mem. at 4–5.) Similarly, Plaintiff Thrivent argues that even if DOL's statements concerning non-enforcement carried legal force, Thrivent would nevertheless remain at risk of non-compliance. (Pl.'s Mootness Mem. at 10–11 [Doc. No. 99].)

The Court is satisfied that an actual, ongoing controversy exists between the parties. Although the Court recognizes the presumption of good faith given to governmental actors when voluntary cessation is involved, the anti-arbitration condition remains in place, the

potential actions of two different agencies are implicated, the rulemaking process can be lengthy, and Thrivent requires certainty for purposes of advance planning and legal compliance. *See CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 414 (D.C. Cir. 2011) (rejecting mootness arguments, stating, "The agency's promised rulemaking has yet to occur, and [the plaintiff's] exemption is merely temporary. Thus, DOT's assurances provide nothing more than the mere possibility that the agency might allow CSI to continue operating.")

### B. Preliminary Injunction

This Court must consider four factors to determine whether preliminary injunctive relief is warranted: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*); *accord Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (quoting *Dataphase*). To analyze these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). A preliminary injunction "is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376 (2008). The burden of establishing the four *Dataphase* factors lies with the party seeking injunctive relief. *Watkins*, 346 F.3d at 844.

### 1.     Irreparable Harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." *Bandag, Inc. v. Jack's Tire & Oil, Inc*., 190 F.3d 924, 926 (8th Cir. 1999) (per curiam) (quoting *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959)).  If monetary damages can compensate the plaintiff for the threatened harm, an adequate remedy at law exists, precluding injunctive relief. *See Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1116 (D. Minn. 2000) (citing *In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 689 (D. Minn. 1995)).  The availability of monetary relief to compensate a portion of the harm does not preclude injunctive relief as to "other less tangible injuries [that] cannot be so easily valued or compensated." *Glenwood Bridge, Inc. v. Minneapolis*, 940 F.2d 367, 371-72 (8th Cir. 1991).  Accordingly, "the availability of money damages that do not fully compensate the movant do not preclude a preliminary injunction." *Id.*

Essentially, Thrivent asserts that the BIC Exemption's anti-arbitration condition presents it with an impossible choice:  either it must comply with the condition, thereby harming its reputation and goodwill, or risk the consequences of noncompliance.  (Pl.'s Mem. Supp. Mot. for Prelim. Inj. at 12–13.)  If Thrivent complies, it argues that it "would have to abandon its successful MDRP in favor of allowing judicial class actions for Thrivent members under a BIC." (*Id.* at 12.)   Such an intrusion upon its business practices, Thrivent argues, would damage both its reputation and goodwill among its customers and in the marketplace.  (*Id.*)  And if Thrivent fails to comply with the anti-arbitration condition, it asserts that it will be subject to the following consequences:  (1)

substantial excise taxes administered by the Treasury Department through the IRS; (2) private class-action lawsuits that might proceed, notwithstanding Thrivent's MDRP, on the grounds that the MDRP's individual arbitration requirement is invalidated by the existing BIC Exemption; and (3) the inability to accurately certify to state regulators that it is in compliance with all state and federal regulations. (*Id.* at 5–6.)

Further, Thrivent argues that even though the anti-arbitration condition is not currently in effect, it is harmed by continued uncertainty and compliance costs. (*Id.* at 14–16.) In particular, it contends that it is required to provide notice of the BIC terms to affected current members no later than December 1, 2017. (Johnston Decl. ¶ 4 [Doc. No. 85].) In order to effectively do so, Thrivent asserts, it must devote its time and resources in advance of the December 1, 2017 deadline. (*Id.*) Further, Thrivent contends that in order to comply with the anti-arbitration provision, it will likely need to amend its MDRP Bylaw to permit the use of the BIC Exemption. (*Id.* ¶ 5.) Any such change in bylaws requires Thrivent to file amendments with the Wisconsin Commissioner of Insurance, and then notify its members through publication in the December issue of *Thrivent Magazine*. (*Id.*) And, Thrivent contends, any inclusion of notice in the magazine must meet copy deadlines in September and October 2017. (*Id.*)

DOL, however, argues that Thrivent's alleged harms are neither certain nor imminent in light of DOL's changed position. (Defs.' Opp'n Mem. to Pl.'s Mot. for Prelim. Inj. at 5.) Because "the possibility remains" that DOL will extend the applicability date or the Court will resolve the case prior to that time, DOL asserts there is no irreparable harm to Thrivent. (*Id.* at 7.) Moreover, it argues that IRS guidance

indicates that Thrivent would not be subject to an excise tax levy for non-compliance. (*Id.* at 7–8.) DOL also discounts as "far too speculative" Thrivent's allegations of irreparable harm from the possibility of putative class action suits in state court. (*Id.* at 8.) Similarly, DOL argues that any current harms, prior to January 1, 2018, are speculative and do not rise to the level of irreparable harm.

The Court finds that Thrivent has sufficiently demonstrated the threat of irreparable harm, both now and in the future. Notwithstanding DOL's current efforts to extend the BIC Exemption's applicability date, (*see* Defs.' Nov. 2, 2017 Notice at 1–2), its own guidance recognizes that regulated entities such as Thrivent "may incur undue expense to comply with conditions or requirements that [DOL] ultimately determines to revise or repeal." (Pl.'s Aug. 30, 2017 Letter, Ex. A (DOL Notice at 2) [Doc. No. 97-1].) While monetary loss alone does not warrant injunctive relief, the current state of regulatory limbo threatens Thrivent with harm that cannot be remedied monetarily. In order to comply with the anti-arbitration condition's applicability date, Thrivent must take actions now that involve changes to its business model. In addition to the expenditure of time and money that these changes necessitate, undertaking such changes may irreparably disadvantage Thrivent against its competitors and with respect to its members. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741–42 (8th Cir. 2002) (affirming the finding of irreparable harm based on potential harm to reputation and goodwill among an association's members); *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (finding irreparable harm where new pricing policy would significantly change franchisee's business model, making it difficult

to reestablish prior business model without the loss of goodwill and reputation).

As to future harm, DOL notes that it has proposed to extend the January 1, 2018 applicability date, and, in fact, has recently submitted to the OMB its proposed notice of final amendments to extend the date. (*See* Defs.' Nov. 2, 2017 Notice at 1–2.) Thus, it argues that the arrival of that date is neither certain nor imminent. (Defs.' Opp'n Mem. to Pl.'s Mot. for Prelim. Inj. at 10.) But, as Thrivent notes, it is not required to demonstrate the *certainty* of harm absent an injunction—it must merely demonstrate the *likelihood* of harm. (Pl.'s Mem. Supp. Mot. for Prelim. Inj. at 10) (citing *Winter*, 555 U.S. at 22). The likely harm to Thrivent's reputation and goodwill, noted above, also exists in the future. Moreover, Thrivent has sufficiently demonstrated the likelihood of future harm with respect to compliance with state regulations. While DOL argues that the applicable state regulations do not require compliance with all applicable laws, but merely require certification of the existence of a code of ethics, (Defs.' Opp'n Mem. to Pl.'s Mot. for Prelim. Inj. at 9), the Court does not read this language so narrowly. Rather, as set forth in Thrivent's Annual Statement for the year ending December 31, 2016, it is required to swear that its "senior officers" are "subject to a code of ethics" that includes "compliance with applicable governmental laws, rules, and regulations." (Johnston Decl., Ex. A (Thrivent 2016 Annual Statement § 14.1) [Doc. No. 85-1].) Given these state regulatory requirements, the Court is unpersuaded by DOL's argument that "it should be sufficient for a company to comply with the federal regulatory regime as applied by the relevant federal agencies—the Department of Labor and the IRS." (Defs.' Opp'n Mem. to Pl.'s Mot. for Prelim. Inj. at 9.)

While DOL argues that it is highly unlikely that the Treasury Department will seek to enforce punitive excise taxes, (*id.* at 7), DOL also acknowledges in its own guidance that "[w]hether, and to what extent, there will be changes" to the BIC Exemption's anti-arbitration condition is "unknown." (Pl.'s Aug. 30, 2017 Letter, Ex. A (DOL Notice at 19).) While the risk may be slight, the very uncertainty of future enforcement exposes Thrivent to the likelihood of irreparable harm.

Because the Court finds that irreparable harm is sufficiently established for all of the above reasons, it need not address whether potential class-action law suits are also likely to cause irreparable harm to Thrivent.

### 2. Likelihood of Success

In order to obtain a preliminary injunction, Thrivent must show that it has a "fair chance of prevailing" on its claims. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). "An injunction cannot issue if there is no chance on the merits." *Mid-Am. Real Estate Co. v. Ia. Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005). However, the question is not whether the movant has "prove[d] a greater than fifty percent likelihood that [it] will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a "fair ground for litigation," *Watkins*, 346 F.3d at 844. "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold*, 508 F.3d at 1143.

Here, because DOL concedes that the anti-arbitration condition violates the FAA, (*see* Aug. 10, 2017 Hr'g Tr. at 4), the Court finds that Thrivent is likely to succeed on the

merits.

### 3. Remaining Factors

Consideration of the remaining factors of the balance of harms and public interest also weigh in Thrivent's favor. DOL will suffer no harm, and the public interest will be served, if it is enjoined from enforcing an invalid rule. *See Bank One, Utah Nat'l Ass'n v. Guttau*, 190 F.3d 844, 847–48 (8th Cir. 1999) (finding that public interest would be served, and state would suffer no harm, if invalid provisions of Iowa law were enjoined).

Accordingly, for all of these reasons, the Court finds that all of the *Dataphase* factors weigh in favor of issuing preliminary injunctive relief. The Court therefore grants Thrivent's motion. The implementation and enforcement of the BIC Exemption's anti-arbitration condition against Thrivent is hereby preliminarily enjoined and restrained until the conclusion of this litigation or such time as the Court so orders. Until the preliminary injunction is dissolved or modified by the Court, Thrivent will not be considered out of compliance with the BIC Exemption as a result of maintaining its MDRP, which includes the individual arbitration of member disputes. Given that this injunction is issued against an agency of the United States, no bond is required. Fed. R. Civ. P. 65(c).

### C. Stay

A district court possesses the authority to stay an action "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936); *see also Lunde v. Helms*, 898 F.2d 1343, 1345 (8th Cir. 1990)). When deciding a motion for a stay, courts consider any potential prejudice to the

non-moving party and, likewise, the potential hardship and inequity to the moving party if the matter is not stayed. *See Scheffler v. Equifax Info. Servs.,* LLC, No. 15-cv-3340 (JRT/FLN), 2016 WL 424969, at *2 (D. Minn. Feb. 3, 2016) (citations omitted). The party requesting a stay bears the burden of demonstrating the need for a stay under the circumstances of the case. *Nken v. Holder*, 556 U.S. 418, 129 S. Ct. 1749, 1761 (2009).

Here, given DOL's reassessment of the challenged provision of the BIC Exemption—a process that continues to develop, as recently as November 1, 2017, (*see* Defs.' Notice at 1–2)—the Court finds that DOL has sufficiently demonstrated the need for a stay. Staying this matter will allow the administrative process to fully develop, possibly resolving this dispute, and thereby promoting judicial economy. Moreover, in light of Thrivent's injunctive relief, awarded above, Thrivent will not be prejudiced by the entry of a stay at this time. In fact, Thrivent expressed its willingness to enter into a stay if the Court were to grant its Motion for a Preliminary Injunction. (*See* Pl.'s Mem. Supp. Mot. for Prelim. Inj. at 2, n. 1.) Accordingly, DOL's motion is granted. Following the issuance of the preliminary injunction, the Court hereby stays these proceedings, pending further order of the Court. The parties shall jointly file a status report every 60 days addressing whether a continued stay of proceedings is necessary.

### D. Summary Judgment

As previously noted, DOL's pending Motion for Summary Judgment is withdrawn. (Defs.' Withdrawal Notice at 1.) In light of the Court's rulings concerning injunctive relief and a stay, the Court denies Plaintiff's Motion for Summary Judgment without prejudice.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Plaintiff's Motion for a Preliminary Injunction [Doc. No. 102] is **GRANTED**, as detailed in this Order;

2. No bond is required pursuant to Fed. R. Civ. P. 65(c), as Defendants are an officer and agency of the United States, exempt from the security requirement;

3. Defendants' Motion for a Stay [Doc. No. 75] is **GRANTED**, following the issuance of the preliminary injunction, as detailed in this Order;

4. Plaintiff's Motion for Summary Judgment [Doc. No. 14] is **DENIED WITHOUT PREJUDICE**; and

5. Defendants' Motion for Summary Judgment [Doc. No. 22] is **WITHDRAWN**.

Dated:  November 3, 2017                          s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge